In the

# United States Court of Appeals
### For the Seventh Circuit

————————

No. 04-3711

JANINE RUDIN,

*Plaintiff-Appellant*,

*v.*

LINCOLN LAND COMMUNITY COLLEGE,

*Defendant-Appellee*.

————————

Appeal from the United States District Court
for the Central District of Illinois.
No. 03 C 3079—**Jeanne E. Scott**, *Judge*.

————————

ARGUED APRIL 11, 2005—DECIDED AUGUST 25, 2005

————————

Before POSNER, RIPPLE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Janine Rudin brought this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., against her employer, Lincoln Land Community College ("LLCC"), for alleged race and sex discrimination. The district court granted summary judgment to LLCC on both claims. Ms. Rudin timely appealed. For the reasons set forth in the following opinion, we reverse the judgment of the district court and remand for further proceedings.

**I**

**BACKGROUND**

**A. Facts**

LLCC is a community college located in Springfield, Illinois. In early 2002, LLCC announced its plan to fill a vacancy for a Business Administration instructor ("the position"), a full-time, tenure-track position in LLCC's Department of Business and Public Services ("the Department"). Over one hundred individuals applied for the position.

Ms. Rudin, who is a Caucasian female, submitted an application for the position. Since 1993, Ms. Rudin had been an adjunct instructor in the Department. According to Ms. Rudin's resume, she possesses a bachelor's degree in management and a master's degree in public administration, both earned from Sangamon State University.

Hiring for the position was governed by LLCC's "Screening and Interviewing Committee Processes and Guidelines" (the "Guidelines"). R.22, Tab 18 at 1. Pursuant to the Guidelines, a screening committee (the "Screening Committee" or "Committee") was convened to review the applications for the position. Richard Bowen, chair of the Department, was the chair of the Screening Committee. According to the procedures set out in the Guidelines, nine other individuals (including Department faculty members, faculty from other departments and LLCC staff members) served on the Screening Committee. The parties agree that the Committee's members did not all participate equally in the hiring process.

The Screening Committee completed the process identified in the Guidelines as "Candidate Screening," in order to "reach a consensus on those candidates" who were acceptable or suitable for an interview. R.22, Tab 18 at 2. Ms.

Rudin was among those selected for an interview by this process.

Following the Screening Committee's review of the candidates, the list of those selected for an interview was sent, pursuant to the Guidelines, to Nicole Ralph, LLCC's Equal Opportunity Compliance Officer, for her review. According to the Guidelines, this review could result in: "(a) proceed[ing] with candidates selected by the committee, (b) add[ing] minority candidates to the pool to be interviewed, or (c) . . . halt[ing] the screening process." R.22, Tab 18 at 3. Ralph testified at her deposition that her role in reviewing the list of interviewees was to "determin[e] if there was sufficient diversity among the interviewees." R.18, Tab H at 2.

It was at this point that Paul Hudson, an African-American male who had applied for the position but who had not been selected for an interview in the Candidate Screening process, was added to the interview pool. Ralph described her rationale for adding Hudson to the list of interviewees: "I saw Hudson's resume and after looking at it, I saw that he was comparable to the other candidates . . . ." R.18, Tab H at 80. She reviewed her selection of Hudson with Bowen, and Hudson was included on the list of candidates to be interviewed. During the Candidate Screening process, Bowen had been the only Committee member to recommend Hudson for an interview.

According to Hudson's resume, he had a bachelor's degree in business administration from Western Michigan University, a master's degree in management from Nazareth College and a master's degree from Western Michigan University in an unspecified field. Hudson had previous teaching experience; according to his resume, he had worked as an instructor teaching business-related courses at seven colleges including LLCC, where he taught a market-

ing course in 1999.

Once the list of candidates to be interviewed had been finalized by adding Hudson's name, interviews for the position were conducted. Not all members of the Committee interviewed all candidates.

Following the candidate interviews, Bowen scheduled a meeting of the Screening Committee at which the Committee would make its recommendation for the position. However, only Bowen and Screening Committee member Arthur Meyer, Jr. attended that meeting. The parties agree that no Committee-wide discussion of the candidates took place.

Despite the fact that Bowen never met with the rest of the members of the Screening Committee, it is clear that, at some point following the interviews, Committee member Meyer compiled rankings of the interview candidates from the rest of the Committee. The Committee members were allowed to cast votes only for candidates they had interviewed. Ms. Rudin was rated second-highest in these rankings. Hudson was ranked second from the bottom.

The parties dispute whether the Committee's rankings were made available to Bowen before he recommended to his superiors that Hudson be hired for the position. Although LLCC contends that Bowen did not have the Committee's rankings as of the day he made his recommendation, Committee member Meyer testified at his deposition that he had forwarded the Committee's rankings of candidates to Bowen before Bowen recommended Hudson.

On April 8, 2002, Bowen recommended Hudson to Eileen Tepatti, LLCC's Assistant Vice President of Instruction. The parties do not dispute that Bowen made the recommendation without the input of the Selection Committee. Also on

April 8, 2002, Tepatti recommended Hudson to Dana Grove, LLCC's Vice President of Academic Affairs. On the same day, Grove passed on his recommendation of Hudson to Dr. James Howard, who was then President of LLCC.

Bowen informed Ms. Rudin in a telephone call of April 12, 2002, that she would not be hired for the position. According to Ms. Rudin, Bowen told her that he had been under "administrative pressure" with respect to the hiring decision and that he "had nothing to do with the decision." R.21, Tab 7 at 126. Ms. Rudin also recalled that Bowen told her that the person who had been hired was not more qualified than she was and had not been teaching at LLCC longer than she had. Bowen did not tell Ms. Rudin that Hudson had been hired.

At some point after learning that she would not be hired for the position, Ms. Rudin contacted and subsequently met with several members of LLCC's Board of Trustees ("the Board") regarding her belief that she should have been hired. It is not clear how many of the seven members of the Board agreed to meet with Ms. Rudin. In her deposition, she testified that she met with four members of the Board. In notes taken around the time of the meeting, she identified five members of the Board with whom she had met.

Around the same time, Ms. Rudin made an appointment to meet with Dr. Howard.[1] At that meeting, Ms. Rudin recalled in her deposition, Dr. Howard told her that "Rich Bowen [was] lying" about the existence of administrative pressure to make a hiring decision. R.21, Tab 7 at 42. He also

---

[1] In her deposition, Ms. Rudin testified that she did not remember when this meeting with Dr. Howard occurred. Some notes that she took closer to the time of the events in this case place the meeting's date at April 30, 2002.

said, "I had nothing to do with who gets hired so there is no administrative pressure." *Id.* Ms. Rudin also recalled that Dr. Howard told her that "there was a problem with the process, the way the hiring was done." *Id.*

On April 24, 2002, Dr. Howard recommended Hudson to the Board, the body that had the ultimate authority to make the hiring decision. The Board did not reach a decision on whether to hire Hudson at that time. Around the time that Dr. Howard recommended Hudson to the Board, he requested that Tepatti document the decision to recommend Hudson. Tepatti prepared two memoranda, dated April 22 and April 29.

Tepatti's April 22 memorandum described the hiring process. It explained that Bowen "considered Paul Hudson qualified and a very successful LLCC adjunct with excellent student evaluations. . . . Given all of this as well as the college's focus on minority hiring, [Bowen] selected him for the position." R.18, Tab G at 9-10. The April 22 memorandum also stated that "the committee was very upset with [Bowen]—Janine was too." R.18, Tab G at 10. Tepatti attributed some of the Committee's reaction to the fact that "some members of the [Department of Business and Public Services] have a problem with the focus on minority hiring goals at the college." *Id.* She also noted that Ms. Rudin had made it clear in the past that she would want the position when it became vacant and suggested that Ms. Rudin had "developed an entitlement attitude in the past couple of years." *Id.*

Tepatti's April 29 memorandum also reviewed the process by which Hudson became the recommended candidate for the job. The April 29 memorandum discussed the process by which Hudson was added to the interview pool, the manner in which the interviewed candidates were evaluated and

Bowen's ultimate decision to recommend Hudson. In the memo, Tepatti stated that she "asked [Bowen] point blank about [Ms. Rudin's] assertions [that Bowen had been pressured to hire Hudson]. Emphatically and without hesitation, [Bowen] responded that he did not tell [Ms. Rudin] or anyone else that 'higher ups' had forced him or put pressure on him to hire Paul Hudson." R.18, Tab D at 15. In her April 29 memorandum, Tepatti endorsed hiring Hudson.

Dr. Howard prepared a memorandum, dated April 30, 2002, again recommending approval of Hudson for the position. Howard's April 30 memorandum further explained that, although "questions were raised concerning proper procedure used in th[e] selection" of Hudson for the position, he was "completely satisfied that established processes have been followed and that the recommendations are both objective and appropriate." R.18, Tab D at 13. Dr. Howard also noted that Hudson's hiring "offer[ed] . . . the opportunity to address the Board's concern with minority representation among faculty and staff at the college." *Id*.

Dr. Howard's memorandum of April 30 and Tepatti's memorandum of April 29 were provided to the Board for a special meeting held May 2, 2002. At that meeting, the Board decided to hire Hudson for the position.

**B. District Court Proceedings**

Ms. Rudin filed the complaint in this action in April 2003. She advanced two Title VII claims: a claim for race discrimination and a claim for sex discrimination. After the parties engaged in discovery, the district court granted LLCC's motion for summary judgment.

The district court determined that there was no direct evidence of race discrimination. Relying on an Eighth Circuit case, *Duffy v. Wolle*, 123 F.3d 1026 (8th Cir. 1997), *cert. denied*, 523 U.S. 1137 (1998), the court concluded that the inclusion of Hudson in the interview pool was not direct evidence of discrimination. The court also concluded that neither Bowen's statements nor the administrative memoranda that justified Hudson's hiring on non-discriminatory as well as diversity grounds constituted direct evidence of discrimination.

The court further determined that Ms. Rudin could not make out a prima facie case of race discrimination based on indirect evidence. Therefore, the court granted summary judgment for LLCC on Ms. Rudin's race claim.[2]

The court next turned to Ms. Rudin's gender claim. As it does on this appeal, LLCC conceded before the district court that Ms. Rudin could establish a prima facie case of gender discrimination. Thus, proceeding according to the framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the court considered whether LLCC had a

---

[2] The court also noted that, even had Ms. Rudin been able to establish the prima facie case for race discrimination, she would have been unable to rebut LLCC's proffered non-discriminatory reason for hiring Mr. Hudson. However, the court did not address the other factors of the prima facie indirect case for reverse racial discrimination.

legitimate, non-discriminatory reason for hiring Hudson. It concluded that LLCC's assertion that it had hired Hudson because he was the most qualified candidate was a legitimate, non-discriminatory reason. Because the district court perceived that Ms. Rudin had not even attempted to establish pretext, it granted summary judgment for LLCC as to her gender claim.

## II

## DISCUSSION

### A. Standard of Review

We review a district court's grant of summary judgment de novo. *Sartor v. Spherion Corp.*, 388 F.3d 275, 277 (7th Cir. 2004). We view all facts in the light most favorable to the nonmoving party, Ms. Rudin, and we draw all reasonable inferences in her favor. *Eiland v. Trinity Hosp.*, 150 F.3d 747, 750 (7th Cir. 1998). We shall uphold the grant of summary judgment if "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

### B. Race Discrimination

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . or otherwise to discriminate against any individual . . . because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has explained that "the obligation imposed by Title VII is to provide an equal opportunity for

*each* applicant regardless of race." *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579 (1978) (emphasis in original).

Ms. Rudin has alleged that LLCC violated Title VII by engaging in intentional discrimination, "i.e., disparate treatment," based on her race. *Nanda v. Bd. of Tr. of Univ. of Illinois*, 303 F.3d 817, 829 n.6 (7th Cir. 2002). Thus, Ms. Rudin "can avert summary judgment for [LLCC] . . . either by putting in enough evidence, whether direct or circumstantial, of discriminatory motivation to create a triable issue or by establishing a prima facie case under the *McDonnell Douglas* formula." *Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 940 (7th Cir.) (citing *McDonnell Douglas Corp.*, 411 U.S. 792), *cert. denied*, 521 U.S. 1104 (1997); *see also Logan v. Kautex Textron N. America*, 259 F.3d 635, 638 (7th Cir. 2001) (noting that "the pertinent question" in a Title VII case "is not whether a plaintiff has direct (including circumstantial) or indirect proof of discrimination, but whether [she] has presented sufficient evidence that [her employer's] decision . . . was motivated by an impermissible purpose").

### 1.

The method of proving race discrimination by putting forth evidence of discriminatory motivation often is called the "direct" method. *See Sheehan*, 104 F.3d at 941. A plaintiff proceeding according to the direct method may rely on two types of evidence: direct evidence or circumstantial evidence.[3] *See Logan*, 259 F.3d at 638; *see also Troupe v.*

---

[3] From the parties' submissions, it appears that both Ms. Rudin and LLCC have confused the direct method of proof with direct evidence of discrimination. Such confusion is understandable;

(continued...)

*May Dep't Stores*, 20 F.3d 734, 736 (7th Cir. 1994).

### a.

"Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland*, 150 F.3d at 751 (internal quotation omitted). Direct evidence "can be interpreted as an acknowledgment of discriminatory intent by the defendant or its agents." *Troupe*, 20 F.3d at 736. Direct evidence is a "distinct" type of evidence that uniquely reveals "intent to discriminate[, which] is a mental state." *Id*.

For instance, in *Mojica v. Gannett Co.*, 7 F.3d 552 (7th Cir. 1993) (en banc), *cert. denied*, 511 U.S. 1069 (1994), which this court later characterized as a direct evidence case, *see Troupe*, 20 F.3d at 736 (citing *Mojica* as a case exhibiting direct evidence of discrimination), the plaintiff testified that, inter alia, a manager had told her "that she would not be

---

[3] (...continued)
"[t]here are several cases that arguably conflate the direct method with direct evidence." *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir. 2003); *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 941 (7th Cir. 1997) ("The confusion lies in the fact that the direct method may employ circumstantial evidence along with or for that matter in place of 'direct' evidence . . ., which in an employment discrimination case would normally require an admission."). Nonetheless, "we reemphasize here that use of direct evidence is merely one of two means (the other being the use of circumstantial evidence) of proceeding under the direct method." *Rogers*, 320 F.3d at 754. Despite the parties' apparent confusion, we shall consider both direct evidence and circumstantial evidence in our inquiry into whether Ms. Rudin has satisfied the direct method of proving race discrimination.

promoted to a more lucrative shift because she was not 'a black male.' " *Mojica*, 7 F.3d at 561. In *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997), we stated that "direct evidence would be what [the employer] said or did in the specific employment decision in question." For example, evidence that an employer "said he discharged [the plaintiff] because he is black" constitutes direct evidence. *Id.*

## b.

Circumstantial evidence of discrimination, on the other hand, allows the trier of fact "to *infer* intentional discrimination by the decisionmaker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (emphasis added). We have recognized three distinguishable kinds of "circumstantial" evidence of intentional discrimination:

> The first consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment. . . . [T]hird is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief . . . .

*Troupe*, 20 F.3d at 736 (internal citations omitted).

Whether the plaintiff proceeding according to the direct method relies on direct evidence or circumstantial evidence, she can avoid summary judgment for the other party by "creat[ing] a triable issue of whether the adverse employment action of which [s]he complains had a discriminatory motivation." *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1397 (7th Cir. 1997).

### 2.

Ms. Rudin's submissions to this court and the district court make reference, however brief, to the direct method of proof. She has not invited our attention to any evidence that meets the definition of direct evidence. As Ms. Rudin points out, however, there is circumstantial evidence of intentional discrimination in this case. *See* Appellant's Br. at 42 (arguing that Ms. Rudin has "offered extensive evidence that clearly *suggests* that race was a motivating factor in the decision to hire [Hudson]" (emphasis added)). Thus, we shall examine the circumstantial evidence of intentional discrimination present in this case.

### a.

We think that the addition of Hudson into the interview pool, when considered with the other facts and circumstances of this case, constitutes circumstantial evidence of racial discrimination.

Some background will assist in placing this issue in perspective. Before the district court, LLCC contended that its policy was a great deal more than simply generating the largest pool of quality applicants. Rather, it argued that its race-conscious hiring process was a permissible way

of increasing diversity in its faculty. *See Grutter v. Bollinger*, 539 U.S. 306, 330 (2003) (approving the University of Michigan Law School's affirmative action program and noting that "substantial" "educational benefits" accompany diversity in the student body of an institution); *see also Comfort v. Lynn Sch. Comm.*, ___ F.3d ___, 2005 WL 1404464 (1st Cir. 2005) (approving use of race as a selection criteria in school transfer policy in order to achieve what local educators deemed an educationally salutary racial balance in schools). However, on this appeal, LLCC makes no such argument and, during oral argument, explicitly abandoned reliance on such an approach. Instead, it simply argues that the practice of inserting minority candidates into the interview pool does not show that race was a consideration in the employment decision at issue here.[4]

While perhaps not sufficient, in itself, to support a finding of racial discrimination, *see Duffy*, 123 F.3d at 1038-39,[5] the practice of including a racial minority in the candidate pool, *when considered with other factors in a case*, can constitute circumstantial evidence of race discrimination. Hudson's

---

[4] LLCC also has not argued that it is obligated to engage in some form of affirmative action in order to comply with a remedial decree or that it is engaging in affirmative action in order to remedy any past discrimination on the part of the institution.

[5] In *Duffy v. Wolle*, 123 F.3d 1026 (8th Cir. 1997), the Eighth Circuit stated that "an employer's affirmative efforts to recruit minority and female applicants does [sic] not constitute discrimination. . . . An inclusive recruitment effort enables employers to generate the largest pool of qualified applicants and helps to ensure that minorities and women are not discriminatorily excluded from employment." *Id.* at 1038-39 (internal citations omitted).

name was inserted into the interview pool according to a stated policy of LLCC that explicitly favored minority over non-minority job applicants; Ralph stated in her deposition that she would not "necessarily look at . . . white applicants" in conducting her review of the candidates selected for interviews. R.21, Tab 5 at 81. Hudson was not simply placed in the general applicant pool; he was allowed to bypass the first elimination.

Although Title VII does not outlaw all private, voluntary, race-conscious affirmative action plans, *United Steelworkers of America v. Weber*, 443 U.S. 193, 208 (1979), the existence of an affirmative action plan may be "relevant to a key issue in a disparate treatment discrimination case: discriminatory intent." *Whalen v. Rubin*, 91 F.3d 1041, 1045 (7th Cir. 1996). Alone, "[t]he mere existence of an affirmative action policy is, however, insufficient to prove that the [employer] actually intentionally discriminated against [the employee]." *Id.* A Title VII plaintiff "must establish a link between the [employer's affirmative action] policies and its actions toward [her]" in order to show intentional discrimination. *Id.*

Without passing judgment on whether at trial Ms. Rudin will be able to persuade the finder of fact of the ultimate fact of discrimination, we conclude that, at the summary judgment stage of these proceedings, the evidence of LLCC's practice of inserting minorities into the interview pool helps establish a triable issue of fact as to whether LLCC had a discriminatory motive when it chose to hire Hudson instead of Ms. Rudin. *See id*. The fact that Hudson was inserted into the interview pool based on his race, when combined with the other facts and circumstances of this case, is certainly relevant and probative evidence that a trier of fact may consider in determining whether LLCC had the

requisite intent to discriminate when it hired Hudson instead of the plaintiff.

### b.

Next, we believe that several statements attributed to Bowen provide a strong basis for drawing an inference of intentional discrimination. Repeatedly, Bowen told others that he was under administrative pressure with respect to the hiring decision; he either suggested or stated outright that he was under pressure to recommend a minority candidate for the position. The most straightforward example is the statement of Meyer, a member of the Selection Committee, who testified in his deposition that he had heard Bowen say that "he knew the administration above him wanted a more diverse set of—more diverse—diversity at Lincoln Land." R.21, Tab 9 at 39. Pat Falconburg, who was Bowen's assistant at the time the hiring decision was made, testified in a deposition that Bowen had told her, "I have to do it this way because I'm getting a lot of administrative pressure." R.21, Tab 2 at 35. Ms. Rudin herself testified at her deposition that, when she had asked Bowen about the hiring decision, "[h]e kept saying administrative pressure, I had nothing to do with the decision." R.21, Tab 7 at 126.

It is true that it is the motivation of the decisionmaker that matters in the Title VII context, *see, e.g., Rogers*, 320 F.3d at 753, and it is also true that the Board—not Bowen—was the final decisionmaker in this case. However, Bowen's statement to Meyer can be understood as an admission that the decisionmakers at LLCC were inclined to hire a candidate from a racial minority. Bowen's comments, considered in light of Dr. Howard's reference— made in a memorandum to the Board—to "the Board's concern with minority

representation among faculty and staff at the college," R.18, Tab D at 13, further strengthen the inference that the Board discriminated against Ms. Rudin based on her race. As well, Tepatti's statements, made in her April 22 memo to Dr. Howard, regarding "the college's focus on minority hiring," R.18, Tab G at 9, further support the inference that the decisionmakers at LLCC hired Hudson because of his race and, in addition, did not hire Ms. Rudin because of her race.

### c.

We believe that the fact that LLCC did not follow its own internal procedures with respect to the hiring process for the position also points to a discriminatory motivation. According to LLCC's Guidelines, the Screening Committee was supposed to "meet[] and thoroughly discuss[] the strengths and weaknesses of each candidate." R.22, Tab 18 at 3. The parties appear to agree that no such meeting took place; although one was scheduled, for some reason the meeting was attended by only one member and the chair, Bowen. Consequently, the views of the Committee members were not aired as anticipated by the Guidelines.

The Committee also was expected to develop a "ranking of the candidates and to identify those candidates who are acceptable and non-acceptable." *Id.* It clearly was anticipated by LLCC's policies that the Committee Chair would "[t]ak[e] into consideration the input presented by the individual committee members" before identifying his candidate of choice and recommending that person to his superiors. *Id.* The parties have presented conflicting assertions regarding whether Bowen was aware of the Committee's rankings before he proceeded with making his recommendation to his supervisor, Tepatti. We pause here

to point out that, if Bowen proceeded to recommend Hudson to Tepatti without consulting with the Committee, that also suggests that a departure from LLCC's stated policies occurred in this case. After all, the Guidelines direct that "[t]he summary of results of the committee deliberations should be attached to [the Committee Chair's] recommendation." *Id.*

At oral argument, LLCC submitted that it was difficult for Bowen to deal with the Screening Committee, whose activities had become contentious. However, we believe that is a question for the jury. The fact remains that LLCC departed from its stated policies. This leaves us with the distinct impression that the Committee's role, while ultimately consultatory, was entirely abandoned in the hiring process.[6] This systematic abandonment of its hiring policies is circumstantial evidence of discrimination.

---

[6] LLCC itself has asserted that the Committee's rankings were not before the Board, the ultimate decisionmaker in this case.

**d.**

We also believe that the fact that LLCC's justification for the hiring decision has been inconsistent is circumstantial evidence of discrimination. As we have described above, to Ms. Rudin, Bowen justified his decision to recommend Hudson by explaining that he was under significant administrative pressure. To Meyer, he justified his decision on the ground that he was under administrative pressure to hire a racial minority. Later, Tepatti's memo to Dr. Howard justified Bowen's recommendation of Hudson on the grounds that Hudson was "qualified and a very successful LLCC adjunct with excellent student evaluations" as well as on the ground that hiring Hudson fulfilled "the college's focus on minority hiring." R.18, Tab G at 9-10. Shortly after that memo was written, Dr. Howard himself explained to the Board that Hudson represented both "an opportunity to enhance [LLCC's] faculty" and "the opportunity to address the Board's concern with minority representation among faculty." R.18, Tab D at 13. On this appeal, however, LLCC contends simply that Hudson was the best qualified candidate for the position. This shifting justification, combined with the other circumstantial evidence of race discrimination which we have just discussed, provides sufficient circumstantial evidence that LLCC discriminated against Ms. Rudin in its hiring decision because of her race and warrants submission of the issue to a trier of fact.

**3.**

As we have just described, Ms. Rudin has put forth substantial circumstantial evidence that LLCC had a discriminatory intent in making its hiring decision for the position. We conclude that the above evidence is sufficient

to create a triable issue as to whether LLCC's hiring of Hudson and its failure to hire Ms. Rudin were motivated by discrimination.


## C. Sex Discrimination

Before the district court, Ms. Rudin also alleged that LLCC violated Title VII by discriminating against her based on her sex. LLCC conceded that Ms. Rudin had established a prima facie case of sex discrimination according to the indirect, burden-shifting method of proof. *See McDonnell Douglas Corp.*, 411 U.S. 792. However, LLCC argued, and the district court agreed, that LLCC had put forth a legitimate, non-discriminatory reason for its decision which Ms. Rudin had failed to rebut. Therefore, the district court granted summary judgment for LLCC on Ms. Rudin's sex discrimination claim.

Before this court, LLCC again concedes that Ms. Rudin has established a prima facie indirect case of sex discrimination. In order to make a prima facie indirect case of sex discrimination, a Title VII plaintiff must establish that she: "1) is . . . a female; 2) applied for, and was qualified for, an open position; 3) was rejected; and 4) the employer filled the position with a person not in the plaintiff's protected class, or the position remained open." *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 454 (7th Cir. 1999). Once the plaintiff has met her burden to establish the prima facie case, "a presumption of discrimination arises, and the employer must articulate a legitimate and non-discriminatory reason for the employment action" in question. *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 900 (7th Cir. 2005). If the employer does articulate such a reason, then "the plaintiff must show by a preponderance of the evidence that

the employer's proffered reasons were merely a pretext for discrimination." *Id.* at 900-01. Throughout this burden-shifting, the ultimate burden of persuasion remains at all times with the plaintiff. *Id.* at 901.

### 1.

We first shall consider whether LLCC has proffered a legitimate, non-discriminatory reason for its hiring decision. LLCC claims that Hudson was hired because he was the most qualified candidate for the position. At this stage, the employer is not required to "prove that it was actually motivated by the proffered reason. Rather, an employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Stockett v. Muncie Indiana Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000) (internal quotation omitted).

LLCC points to numerous pieces of evidence in the record which it claims provide support for its proffered reason. For instance, it cites Bowen's memorandum of April 8, 2002, in which he recommended Hudson for the position. In the memo, Bowen informed Tepatti that, after a "highly competitive" interview process, he had concluded that Hudson should be hired for the position due to, among other considerations, his "[e]xcellent student evaluations," his "[t]wo master's degrees" and the fact that Bowen perceived that Hudson was "working on [his] PhD." R.18, Tab E at 11. Among other evidence supporting its justification for the hiring decision, LLCC also cites Tepatti's two memoranda written for Dr. Howard. Tepatti's memorandum of April 29, 2002, which the Board had before it when it decided to hire Hudson, states that Hudson is "qualified

and a very successful LLCC adjunct with excellent student evaluations." R.18, Tab D at 5. As well, the April 29 memorandum notes that Hudson "possesses two masters' [sic] degrees and is a dissertation short of getting his doctorate." *Id.*

Based on the evidence cited by LLCC, we must conclude that it has proffered a legitimate, non-discriminatory reason for its hiring decision and supported the reason with admissible evidence.

**2.**

We next turn to the question of whether Ms. Rudin can show, by a preponderance of the evidence, that LLCC's proffered reason is pretext for sex discrimination.[7] Because it is a subject of debate between the parties, we first shall review the showing that is required of a plaintiff with respect to pretext at the summary judgment stage of a Title

---

[7] In her submissions to this court on appeal, Ms. Rudin barely mentions her sex discrimination claim in the context of her arguments on pretext. Usually, this would be grounds for holding that the argument is waived. *See Kramer v. Banc of America Sec., LLC*, 355 F.3d 961, 964 n.1 (7th Cir.) ("The absence of any supporting authority or development of an argument constitutes a waiver on appeal."), *cert. denied*, 124 S. Ct. 2876 (2004). However, we believe that the paucity of references to her sex discrimination claim is due to the posture in which the present case reached us. The district court dealt with both the race and sex discrimination claims by way of the *McDonnell Douglas* burden-shifting method; therefore, both parties framed their arguments before this court on pretext in general terms most likely intended to apply *both* to the race discrimination claim and to the sex discrimination claim.

VII case.

**a.**

The parties agree that Ms. Rudin must show that there is genuine issue of material fact as to whether LLCC honestly believed its stated justification for hiring Hudson. However, they dispute whether she *also* is required at the summary judgment stage to show that LLCC had a discriminatory animus based on sex. The answer is that "at summary judgment the plaintiff is not required to establish pretext *and* provide evidence of a discriminatory motive by the defendant . . . . This level of proof is only required when a plaintiff's case is submitted to a finder of fact." *Mills*, 171 F.3d at 458.

On the issue of proving pretext, the Supreme Court has stated that "[t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) *may*, together with the elements of the prima facie case, suffice to show intentional discrimination." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (emphasis added). We understand that language to mean that, "once the employee has cast doubt upon the employer's proffered reasons for the termination, the issue of whether the employer discriminated against the plaintiff is to be determined by the jury—not the court." *Weisbrot v. Med. Coll. of Wisconsin*, 79 F.3d 677, 681-82 (7th Cir. 1996). Therefore, we have held that, "in order to survive a motion for summary judgment, an employee need only 'produce evidence from which a rational factfinder could infer that the company lied about

its proffered reasons for [her] dismissal.' "[8] *Id.* at 682 (quoting *Courtney v. Biosound, Inc.*, 42 F.3d 414, 424 n.4 (7th Cir. 1994)). In other words, if there is a question of fact as to the believability of an employer's purported reasons for an employment decision then, "even if the evidence presented by [the plaintiff] does not compel the conclusion that [her employer] discriminated against [her] when making its . . . decision, at a bare minimum it suffices to defeat [the employer's] summary judgment motion." *Biosound*, 42 F.3d at 423.[9]

## b.

_____

[8] Phrased differently, "[s]ummary judgment is proper where no rational factfinder could believe that the employer lied about its proffered reasons for" the hiring decision in question. *Weisbrot v. Med. Coll. of Wisconsin*, 79 F.3d 677, 682 (7th Cir. 1996).

[9] It is worth pointing out that, at trial, the ultimate burden of persuasion on the question of sex discrimination remains at all times with Ms. Rudin. To prevail at trial on her sex discrimination claim, Ms. Rudin will have to persuade the jury that the real reason LLCC failed to hire her was because it discriminated against her on account of sex. *See Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) ("Although an inference of discrimination may be drawn from falsely stated reasons, such an inference is not compelled. . . . [T]he real reasons behind an employer's action may be shameful or foolish, but unrelated to . . . discrimination, in which event there is no liability."). Thus, as we have noted before, "the plaintiff might be well advised to present additional evidence of [sex] discrimination, because the factfinder is not *required* to find in her favor simply because she establishes a prima facie case and shows that the employer's proffered reasons are false." *Anderson v. Baxter Health Care Corp.*, 13 F.3d 1120, 1124 (7th Cir. 1994) (emphasis in original).

As evidence that LLCC lied about its reason for hiring Hudson, Ms. Rudin contends that: (1) Bowen's justification for not hiring Ms. Rudin has changed over time; (2) Bowen failed to follow LLCC's hiring policies; (3) Ms. Rudin was more qualified than Hudson; (4) race was a factor in the decision to hire Hudson; and (5) Bowen was under administrative pressure to hire a minority candidate.

As we already have noted, Bowen's justification for hiring Hudson instead of Ms. Rudin has changed over time. This court's decisions make it clear that "[o]ne can reasonably infer pretext from an employer's shifting or inconsistent explanations for the challenged employment decision." *Applebaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003); *see also Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 577 (7th Cir. 2003) ("Shifting and inconsistent explanations can provide a basis for a finding of pretext.").

As further evidence of pretext, Ms. Rudin points to the fact that Bowen failed to follow LLCC's hiring policies. Specifically, she submits that Bowen failed adequately to take into consideration the recommendations of the Screening Committee and that he failed to attach a summary of the Committee's deliberations to his ultimate recommendation of Hudson. This court has held in the past that an employer's failure to follow its own internal employment procedures can constitute evidence of pretext. *See Giacoletto v. Amax Zinc Co., Inc.*, 954 F.2d 424, 427 (7th Cir. 1992). As we have discussed above, the record supports the conclusion that the hiring process in this case departed from the process contemplated by LLCC's own Guidelines.

Ms. Rudin also claims that pretext is shown from the fact that she was more qualified than Hudson. Therefore, she contends, "the notion that Mr. Hudson was the more qualified is simply not true." Appellant's Br. at 40. How-

ever, "the pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate." *Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 330 (7th Cir. 1996). Thus, even if Ms. Rudin could prove she is more qualified than Hudson (a question we need not take up),[10] that fact would not show pretext as long as LLCC *believed* Hudson to have the superior qualifications. We do not believe that Ms. Rudin's qualifications, whether or not they were superior to Hudson's, are probative of the truthfulness of LLCC's stated justification for hiring Hudson.

As her final evidence of pretext, Ms. Rudin also contends that race was a factor in the decision to hire Hudson and that Bowen was under administrative pressure to hire a minority candidate. To the extent that it is untruthful for LLCC to deny that it considered Hudson's race, in the face of the clear evidence that LLCC's hiring process gave a strategic advantage to racial minorities, these grounds provide some evidence of pretext. *See, e.g., Perdomo v. Browner*, 67 F.3d 140, 145 (7th Cir. 1995) ("Because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes summary judgment."). However, these two closely-related contentions are more properly considered probative of the question of whether LLCC discriminated against Ms. Rudin based on race than whether LLCC's stated justification is a mere pretext for sex discrimination. At trial, evidence of pressure to hire or preference for hiring a racial minority would not support a reasonable inference

---

[10] We note, however, that "[a]n employee's self-serving statements about [her] ability . . . are insufficient to contradict an employer's negative assessment of that ability." *Gustovich v. AT&T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992).

of sex discrimination. *See Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1174 (7th Cir.) (holding that question at trial is whether there is sufficient evidence to support a finding that the employer discriminated against the plaintiff based on the protected ground), *cert. denied*, 537 U.S. 884 (2002).

Viewing all facts in the light most favorable to Ms. Rudin and drawing all inferences in her favor, we conclude that a rational jury could indeed believe that LLCC was not truthful about its proffered reasons for hiring Hudson. Therefore, we reverse the district court's grant of summary judgment on Ms. Rudin's sex discrimination claim.

### Conclusion

For the foregoing reasons, the judgment of the district court is reversed, and the case is remanded for proceedings consistent with this opinion.

REVERSED and REMANDED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*