In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1768

KENDALL REID and BRADLEY SEARS,

*Plaintiffs-Appellants,*

*v.*

NEIGHBORHOOD ASSISTANCE
CORPORATION OF AMERICA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 11-CV-8683 — **Amy J. St. Eve**, *Judge.*

ARGUED NOVEMBER 7, 2013 — DECIDED APRIL 1, 2014

Before BAUER, MANION, and SYKES, *Circuit Judges.*

MANION, *Circuit Judge.* Plaintiffs Kendall Reid and Bradley Sears allege that Neighborhood Assistance Corporation of America discharged them in retaliation for making protected complaints, in violation of Illinois law. It is undisputed that the plaintiffs made protected complaints and were discharged, but the district court granted summary judgment to NACA, concluding that plaintiffs had not offered sufficient evidence

of causation—that is, whether they were discharged *in retalia-
tion for* their complaints. Plaintiffs appeal, arguing that the
district court failed to view the evidence (and draw all reason-
able inferences) in the light most favorable to them. We affirm.

## I. Factual Background

*A. Plaintiffs' Employment*

Plaintiffs Kendall Reid and Bradley Sears were hired as at-
will employees by Neighborhood Assistance Corporation of
America ("NACA") in October 2007 and May 2010, respec-
tively. They worked out of NACA's Chicago office. NACA is
a nationwide not-for-profit corporation that helps potential
homeowners—especially those facing discriminatory or
predatory lending—obtain mortgages to purchase homes. Reid
and Sears worked as mortgage consultants and reported to an
office manager in the Chicago office, Norma Martinez. Marti-
nez answered to a regional operations director in Baton Rouge,
Louisiana, Donald Meadows. As mortgage consultants,
plaintiffs were responsible for counseling potential homeown-
ers, helping them assemble mortgage applications, and for
forwarding the applications initially to underwriting and,
eventually, to lenders. Mortgage consultants are required by
federal law to hold a license in order to prepare mortgage
applications. *See* 12 U.S.C. § 5103 (Supp. 2013). Reid and Don
Meadows (the regional manager) were the only people tied to
the Chicago office who held the appropriate licenses. Sears had
held a license, but it had not been properly registered by
NACA, so he was not appropriately licensed.

As part of preparing the mortgage applications, mortgage
consultants handle documents containing the private personal

information of NACA's clients. Accordingly, NACA had a Document Security Policy (the "paperless policy") that required employees to scan documents into a secure digital system and shred the paper originals to protect the client's information—paper files for clients were not to be kept. Evidence shows that the policy had been at least emailed to managers, but it had not been enforced in the Chicago office during the time plaintiffs worked there.

*B. Plaintiffs' Complaints*

While working for NACA, plaintiffs made a number of complaints about NACA's business practices. First, they complained about being paid less than Illinois' minimum wage. Effective July 1, 2010, Illinois raised its minimum wage to $8.25 an hour ($1 above the federal minimum wage). 820 ILCS 105/4 (Supp. 2013). Before the effective date of the increase, Reid asked whether NACA would pay the new minimum wage and received mixed answers from different managers. Soon thereafter, another (unspecified) employee brought up the complaint at a company meeting and NACA's CEO, Bruce Marks, replied that NACA "will pay you what we have to pay … ." Reid Dep. at 73–74. Throughout that July, Reid complained to the office manager and the regional manager that he and other employees were not being paid the new minimum wage, and on at least one occasion, that he was not paid overtime when he should have been.

Second, plaintiffs complained on several occasions that NACA violated state and federal law in handling mortgage applications. Specifically, they complained that mortgage applications were being prepared by unlicensed mortgage

consultants and signed by licensed mortgage consultants. They also complained that when this happened, NACA was splitting the commissions between licensed and unlicensed mortgage consultants and the company itself. During an audit of NACA in February and March of 2010, Reid spoke with state and federal regulators who told him that these practices were illegal. After learning the practices were illegal, Reid complained to NACA management as early as April and May 2010. He made several complaints to NACA management over the next few months, including his last complaint in late September 2010. Sears also brought similar complaints to management throughout that time, making his last complaint on October 11, 2010. Sears's complaints were along different lines. This time he complained that NACA had dropped the ball during his licensing process, and as a result, he was not properly licensed and was not receiving the full commission from NACA for applications signed by other, licensed mortgage consultants. Nonetheless, Sears's complaints contained the same argument that the practices were illegal.

In sum, plaintiffs' complaints spanned a period of five to six months. But they were not alone in their complaints. At least four other individuals complained about not being paid minimum wage, others complained about not receiving proper overtime pay, and at least five others complained about splitting commissions on mortgage applications prepared between licensed and unlicensed mortgage consultants. Further, at least three people complained about both minimum wage and commission splitting. All of these other complaining employees were also in the Chicago office and none of them was fired.

*C. Plaintiffs' Termination*

On Friday, October 8, 2010, Reid left the NACA office early to attend a Chicago Bulls game. According to Reid, he received permission from the office manager, Martinez, on the condition that he work the whole weekend. That weekend, NACA's Chicago office was operating as a back-up call center for another NACA office that was hosting an event. However, when Reid came in to work on Saturday morning, October 9, Martinez told him that he was being suspended for leaving early the night before. Martinez denies that she gave Reid permission to leave, but at least one other witness corroborates Reid's story, so—because we view the evidence in the light most favorable to Reid—we must assume that he had permission to leave, but was suspended regardless.

On Monday, October 11, Rachelle Pride, NACA's National Real Estate Director, visited the Chicago office as part of a nationwide effort to train NACA-affiliated real estate agents. On that day, the office was closed for business and staffed only by the skeleton crew of Sears, Martinez, and another mortgage consultant, Mariola Jasinska.[1] Martinez gave Pride a tour of the office. During the tour, Pride noticed a number of violations of NACA's policies, including alcoholic beverages in Reid's office and volumes of paper copies of documents with confidential information visible throughout the Chicago office, in violation of the paperless policy. Pride called Marks to get instructions. He told her to coordinate with Human Resources ("HR") and then ask that Sears and Jasinska turn in their office keys and

---

[1] That Monday was Columbus Day.

leave the office for the remainder of the day. After talking to Christine Cannonier in HR, Pride met with Sears and Jasinska individually to explain the violation of the paperless policy, receive their keys, and ask them to leave, which they did. Pride explained to Jasinska that she was not fired at that time, but that she did need to leave for the day. Sears testified that Pride told him he was fired as soon as she saw the violations of the paperless policy, but Pride denies that. In any event, Sears received formal notice of his termination on October 14.

Then, pursuant to Cannonier's instructions, Pride photo-graphically documented the violations of the paperless policy. The photos revealed that every employee in the office but one was in violation of the policy. Marks and Cannonier asked Pride to stay in Chicago a while longer to interview the office's customers. During those interviews, Pride discovered that applications assembled by Reid had not been timely forwarded and, as a result, all of the customers' information had expired and would need to be redone. That delay was also a violation of NACA policy. Pride passed all this information along to Marks, who also spoke with Cannonier and Meadows. Through some of the conversations and conference calls, Marks was made aware that Sears's client service was poor, though at the time of his deposition he could not recall from whom he had heard that.

Faced with an entire office in violation of its paperless policy, NACA asserts that it decided to fire three people: Jasinska and plaintiffs Reid and Sears. In an early response to an interrogatory asking for the names of "all" people involved in making the decision to fire the plaintiffs, NACA listed only Cannonier, Meadows, and Pride. However, there is conflicting

evidence concerning how and by whom the firing decision was made, with deposition testimony indicating that it was either just Bruce Marks or a group of managers. NACA later updated its interrogatory answer to include Marks among those involved in making the decision (consistent with the prior deposition testimony of Meadows, and Cannonier and the later testimony of Marks and Pride). NACA insists (and Marks testified) that, though Marks consulted with other managers, he alone made the final decision to fire plaintiffs. It is undisputed that he was not aware of plaintiffs' complaints. Nonetheless, viewed in the light most favorable to the plaintiffs, in addition to Marks, at least Meadows, Cannonier, and Pride had a hand in making the decision and Cannonier and Meadows had knowledge of plaintiffs' complaints. Sears and Reid received formal notice of their termination on October 14, 2010.[2]

NACA justifies its decision to fire Reid and Sears based on their violations of the paperless policy and on its belief that Reid had left work early for the Bulls game. Later in discovery, NACA explained that the reason Reid and Sears were fired—while other violators of the paperless policy were not—was that Reid and Sears had problems in addition to their violation of the paperless policy. These problems included the

---

[2]  Martinez was also later terminated, in part because of the violations of the paperless policy that occurred under her management of the Chicago office.

alcohol in Reid's office, his expired client files, and Marks's perception that Sears's customer service was poor.[3]

After their termination, plaintiffs brought suit in Illinois state court alleging state law retaliation claims. NACA removed to federal court and subsequently moved for summary judgment. The district court granted NACA's motion, concluding the plaintiffs had not offered sufficient evidence for a jury to find in their favor regarding causation. Plaintiffs appeal, arguing that the district court failed to construe the record in the light most favorable to them and that both (1) the timing of their firing in relation to their complaints, and (2) the evolution of NACA's interrogatory answers about the reasons for, and the decision-makers involved in, their termination create an inference that Reid and Sears were really fired for their protected complaints.

## II. Discussion

We review the district court's summary judgment ruling *de novo*. *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005). Summary judgment is warranted if the evidence, when viewed in the light most favorable to the non-moving party, presents "no genuine issue as to any material fact" such that "the moving party is entitled to a judgment as a matter of law." *Id.* (citing Fed. R. Civ. P. 56(c)). A "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must

---

[3] Marks testified that Jasinska was also selected for firing based on an attendance problem in addition to her violations of the paperless policy.

view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Id.* at 773.

To survive a motion for summary judgment on an Illinois retaliatory discharge claim, a plaintiff must have offered sufficient evidence for a jury to find that (1) the employer discharged the employee (2) in retaliation for the employee's protected activities, and (3) that the discharge was in contravention of a clearly mandated public policy. *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 881 (Ill. 1981).

Plaintiffs were discharged after they complained that NACA's wage and hour practices and mortgage application practices violated Illinois and federal law, which the parties assume were protected complaints.[4] Accordingly, the only issue before us is whether plaintiffs proffered sufficient evidence that their discharge was in retaliation for their complaints. Simply put, the question is whether the plaintiffs offered proof of causation. For the element of causation, "the ultimate issue to be decided is the employer's motive in discharging the employee." *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 730 (Ill. 1992).

Retaliation claims under Illinois law differ from federal retaliation claims under the *McDonnell Douglas* framework, where a plaintiff can present a *prima facie* case and shift the

---

[4]  Specifically, the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1, *et seq.*, the Illinois Residential Mortgage License Act ("IRMLA"), 205 ILCS 635/1-1, *et seq.*, and the Secure and Fair Enforcement for Mortgage Licensing Act ("SAFE" Act), 12 U.S.C. § 5101, *et seq.*

burden to the defendant to provide a legitimate reason for a termination. Instead, Illinois law requires the plaintiff to offer affirmative evidence of causation to survive summary judgment. *Gacek v. Am. Airlines, Inc.*, 614 F.3d 298, 300, 303 (7th Cir. 2010). Such evidence need not (and often will not) be direct evidence of the employer's motive, since an employer will generally know better than to explicitly reveal that a discharge is motivated by the employee's protected complaints. Rather, the evidence will typically be circumstantial. That includes factual scenarios that give rise to a reasonable inference that the employer's motive was retaliatory. *See Hugo v. Tomaszewski*, 508 N.E.2d 1139, 1141 (Ill. App. Ct. 1987) ("A plaintiff in a [retaliatory discharge case] will often be required to rely heavily upon circumstantial evidence of the employer's intent … ."). Ultimately, we look at the record as a whole to see whether a jury could reasonably infer that NACA's motive for firing Reid and Sears was retaliation for their complaints. *See, e.g., Zuccolo v. Hannah Marine Corp.*, 900 N.E.2d 353, 360 (Ill. App. Ct. 2008) (summarizing the pertinent circumstances of the whole record and concluding that "a rational trier of fact could find that [the employer] had a retaliatory motive").[5]

Preliminarily, plaintiffs argue that the district court failed to properly apply the summary judgment standard and draw certain inferences favorable to the plaintiffs from the evidence.

---

[5]   This method of proof correlates with the "direct method" in a federal retaliation claim, where the plaintiff has the burden to prove causation either by direct evidence or, as is more common, by a "convincing mosaic" of circumstantial evidence. *See Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012) (explaining the use of circumstantial evidence in the direct method).

Plaintiffs urge that, as we review *de novo*, we should draw two inferences: first, that only Meadows, Cannonier, and Pride (and not Marks) were involved in the decision to terminate the plaintiffs; and second, that "NACA's alleged reasons for terminating" plaintiffs are "limited to" the reasons initially "alleged" (that both Reid and Sears violated the paperless policy and also that Reid left work early for the Bulls game).

Plaintiffs base their first proposed inference on NACA's omission of Marks's name from its earliest interrogatory answer about those individuals involved in plaintiffs' termination. This initial omission is not a conclusive admission. The interrogatory question was updated after Cannonier and Meadows had consistently testified that Marks was involved in the termination decision, which Marks's and Pride's later testimony confirmed. Because every single witness with personal knowledge consistently testified that Marks was involved in the firing decision and the only contrary evidence is an omission from a now-amended interrogatory answer, a jury could not reasonably find that Marks was not involved. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Plaintiffs' second proposed inference is better viewed as an argument that NACA's later explanation of additional reasons for plaintiffs' termination should be viewed as evidence of pretext (which could give rise to an inference of retaliatory intent); as such, we turn to the record to discern whether an

inference of retaliatory intent is reasonable and address this argument in due course.[6]

Plaintiffs make two main arguments in support of causation from the circumstances of their termination. First, that the proximity in time of their termination to their complaints gives rise to a reasonable inference of retaliatory intent. Second, plaintiffs argue that NACA's "'moving target' defense" of shifting reasons for their termination and shifting positions on who made the decision to fire them shows that the reasons are pretextual and also gives rise to a reasonable inference of retaliatory intent.

*A. Timing*

Plaintiffs argue that the fact that Sears had complained three days, and Reid complained eleven days, before they were fired gives rise to a reasonable inference of retaliatory animus. In support, they rely on our decision in *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011). In *Loudermilk*, a worker tasked with tearing down pallets complained about racial discrimination when he (a black man) was tasked to do a job that was normally done by two men, and when his coworkers (Hispanic men) hurled racial epithets at him. *Id.* at

---

[6] The parties also discuss a doctrine called "mend the hold," whereby insurance companies are required to stick to the first reasons they offer for denying coverage. There is no reason to extend such a doctrine to retaliation cases where the ultimate question is the employer's intent and, as long as the new reasons are offered during discovery, the plaintiff has ample time to investigate and build an argument that they are pretextual. Besides, because the plaintiffs raise this argument for the first time on appeal, it is waived. *Keene Corp. v. Int'l Fid. Ins. Co.*, 736 F.2d 388, 393 (7th Cir. 1984).

313–14. His complaints spanned about one month. Towards the end of that month, he took pictures of the work that was done (with the intent of later proving the work required two men). *Id.* at 314. When management confronted him, he reiterated his complaints and was told to "Put it in writing." He did so the next day and his manager "fired him on the spot." *Id.* In *Loudermilk*, we described the timing analysis this way:

> Suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment. Occasionally, however, an adverse action comes so close on the heels of a protected act that an inference of causation is sensible. Deciding when the inference is appropriate cannot be resolved by a legal rule; the answer depends on context, just as an evaluation of context is essential to determine whether an employer's explanation is fishy enough to support an inference that the real reason must be discriminatory.

*Id.* at 315 (citations omitted). We applied that analysis to the facts of *Loudermilk* and concluded that an inference of discriminatory intent was reasonable, so a jury should decide whether it was appropriate. *Id.* We had reached a similar result before in *McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 792 (7th Cir. 1997), also cited by plaintiffs. There, amidst an escalating conflict where the employee accused the employer of discrimination and the employer counter-accused the employee of insubordination, the employee filed a lawsuit and was fired three days later. *Id.* at 792–93. Under the *McDonnell Douglas* framework, we concluded that the "sequence of events [was]

sufficient" to reasonably infer retaliatory intent. *Id.* at 796–97. Nonetheless, we granted summary judgment because the employee failed to raise any genuine issue about his employer's reasons for firing him (insubordination). *Id.* at 799.

An inference of retaliatory intent from the timing of Reid's and Sears's discharges is not reasonable because the evidence as a whole does not permit such an inference. In context, the "sequence of events" leading to plaintiffs' termination was six months of occasional complaints. There is no evidence that plaintiffs' complaints escalated; if anything their complaints became less serious—Reid had spoken to state and federal regulators months before he was fired, but leading up to his termination, he had only sent emails and made comments in person or over the phone. All of Sears's complaints were just the occasional email or remark. Finally, plaintiffs' termination was immediately preceded by an intervening event unrelated to their complaints—Pride, an executive unfamiliar with plaintiffs or their complaints, discovered pervasive violations of NACA's paperless policy. *Cf. Loudermilk*, 636 F.3d at 314 (decision to terminate made the moment plaintiff handed the employer his written complaint).

Turning to the record as a whole, an inference of retaliatory intent becomes even more unreasonable. Almost everyone in the office, not just the plaintiffs, complained about the same issues—wages and commission-splitting—but the others were not fired. However, someone was fired simultaneously with Reid and Sears, Mariola Jasinska, but there is no specific evidence that she had made similar complaints (only the vague statements that "everyone complained"). Further, although Illinois retaliatory discharge law does not require an employer

to proffer reasons for firing an employee, NACA has. NACA states it fired Reid for violating the paperless policy, letting client files expire, having alcohol in his office, and leaving work early for a Chicago Bulls game.[7] NACA states that it fired Sears because of his violations of the paperless policy and because of Marks's perception that his customer service was poor. The timing in this case does not give rise to a reasonable inference of retaliatory intent.

### B. "'Moving Target' Defense"

In turn, plaintiffs argue that NACA's defense of this case has involved shifting and inconsistent positions that, along with other evidence, point to pretext and retaliatory intent. First, plaintiffs argue that NACA's reasons for firing them were pretextual because a violation of the paperless policy did not by itself merit termination. The other reasons—alcohol, expired documents, and poor customer service—were additional excuses for the earlier decision to terminate. Every manager who testified thought that a violation of the paperless policy was sufficient grounds to fire an at-will employee. The only evidence that the plaintiffs cite to dispute that proposition is Marks's testimony. Marks said that the plaintiffs were not fired merely for the paperless violation (though they could

---

[7]  Reid offers testimony that Martinez gave him permission to go to the game, and so we assume that is true. But he offers no evidence that the decision-makers—Cannonier, Marks, Meadows, and Pride—knew about that dispute, nor has Reid offered any other evidence that the group that decided to fire him did not genuinely believed those reasons were valid. *Gacek*, 614 F.3d at 303 (an Illinois retaliatory discharge plaintiff "could not have prevailed merely by proving that the reasons given by the airline for firing him were unworthy of belief").

have been) but for that violation and the plaintiffs' additional problems, because if everyone who had violated the policy had been fired, the Chicago office would have had only one employee left. Plaintiffs argue that this statement is evidence that NACA management did not really believe that violating the paperless policy alone merited termination. Plaintiffs further argue that, because the other reasons for their termination were added later, that tends to indicate the reasons were pretextual.

From day one, NACA has asserted that Reid and Sears were fired based on their violations of the paperless policy and Reid's attendance issues, and all the managerial testimony corroborates this. When Marks was deposed on August 16, 2012, he asserted that he was the final decision-maker, and again corroborated these reasons. However, he also stated that because so many people had violated the policy, he looked for additional reasons to justify terminating any one particular employee. Further, he testified that the alcohol that Pride had found in Reid's office, Reid's incomplete and expired client files, and Marks's perception that Sears's client service was poor influenced his decision to select Reid and Sears for termination.[8] Pride's testimony corroborated some of these problems, and her photographs confirmed the presence of alcohol in Reid's office. Reid does not deny that he had bottles of alcohol in his office, but states that they were unopened and were just on display. But an employer's reason need not be good, just genuinely believed to be true. *Everroad v. Scott Truck*

---

[8]  Plaintiffs offer no evidence against their managers' assessments of their performance except their assertions that they performed satisfactorily.

*Sys., Inc.*, 604 F.3d 471, 478 n.2 (7th Cir. 2010) ("So long as they genuinely believed in the truth of their stated reason for the decision, that reason is not pretextual."). Despite these additional reasons, NACA's interrogatory responses have always listed only the violation of the paperless policy and Reid's leaving work early as the reasons for plaintiffs' termination. Plaintiffs contend that this is enough for a jury to reasonably conclude that NACA did not really believe the reasons it gave for firing plaintiffs. In reliance, plaintiffs cite our decision in *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733 (7th Cir. 2013).

In *Hitchcock*, we held that a jury could reasonably infer that proffered reasons for a termination were pretext because they were shifting and inconsistent. *Id.* at 738 (citing *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 726 (7th Cir. 2005)). A couple of months after Hitchcock had discovered she was pregnant, she visited a patient at her home. *Id.* at 734–35. Upon arriving, she found she was unable to access the patient because of the strange behavior of the patient's son, and it was later determined that the patient had been dead for a couple days. *Id.* at 736. Nonetheless, her employer fired her and provided multiple reasons including: that she had assessed a dead patient; that she took actions that compromised that patient's health and safety; that she *would have* compromised the health and safety of the patient (had she not been dead) by failing to do something because of the son's intimidating behavior; and, finally, later in litigation, that she had performed a deficient assessment of the dead patient (without any specifics about how the assessment was deficient). *Id.* at 738. Unsurprisingly, we held that a jury could reasonably find holding someone accountable for compromising the health of an already-dead

patient was a pretextual reason, and the later inconsistent shifts were also indicative of pretext.

But NACA's reasons suffer from no such infirmities. From the moment of plaintiffs' termination to this very day, NACA has consistently maintained that the main reason for plaintiffs' termination was their violation of the paperless policy. Every manager involved in the termination consistently gave the violation of the paperless policy as the main reason. Marks's additional reasons are not inconsistent, and were not a shift from the main reason. He explained why some employees who violated the paperless policy were terminated and other were not. *See Schuster v. Lucent Techs., Inc.*, 327 F.3d 569, 579 (7th Cir. 2003) (holding that "an additional, not necessarily inconsistent reason for the employment decision, rather than an abrupt change in explanation" does not give rise to an inference that the reasons are pretextual). A jury might reasonably be suspicious if the people with additional problems who were fired were complainers and those who were retained were non-complainers, but that is not the case. Numerous other employees who complained and violated the policy were not fired while Jasinska was fired for violating the policy with no evidence of her having complained save the assertion that "everyone complained." Plaintiffs' manager, Norma Martinez, was also terminated afterwards, in part because of the pervasive violations of the paperless policy.

Second, plaintiffs argue that NACA's shift respecting who the decision-makers were gives rise to an inference of mendacity, and therefore, retaliatory intent. We disagree. NACA's in-house counsel answered the interrogatories with the information he had at the time about who was involved in the decision

to fire plaintiffs. When every manager later testified that Marks was involved, NACA changed the interrogatory answer and Marks was deposed. He testified that, as CEO, he was the final authority on the firing decision. NACA changed its strategy to assert the same, no doubt pleased that the undisputed evidence showed that Marks had no knowledge of the plaintiffs' complaints. To account for this shift, we have viewed the evidence in the light most favorable to the plaintiffs and said that a jury could believe that Marks was not the sole decision-maker. But this shift in litigation strategy does not bear on the decision-makers' intent; if the decision really was made by Pride, Cannonier, and Meadows, in addition to Marks, the fact that Marks later claimed full responsibility does not mean that it would be reasonable to infer that the decision-makers acted with a retaliatory intent when making the decision. *See Schuster*, 327 F.3d at 579 ("the changing story as to who actually participated in the decision … is also insufficient to raise a question as to whether the … reasons given are merely pretextual").

In sum, though plaintiffs had made protected complaints shortly before their termination, the same complaints had been going on for some time and, if anything, had declined in gravity. NACA asserts that it fired the plaintiffs for various policy violations, which the undisputed evidence shows that the decision-makers genuinely believed. The reasons NACA offered, though they were later added to in order to explain why others were not terminated, were not shifting or inconsistent, and there was no suspicious pattern in the employees it chose to fire or retain. Viewing the evidence as a whole, we agree with the district court that an inference of retaliatory

intent is not reasonable. Because there is also no direct evidence, plaintiffs have failed to create a genuine issue about the material fact of causation. Therefore, summary judgment for NACA was appropriate.

### III. Conclusion

Plaintiffs alleging retaliatory discharge in Illinois are required to produce evidence sufficient for a jury to reasonably infer that they were terminated in retaliation for their protected complaints. Because plaintiffs have not done so, summary judgment in favor of NACA was appropriate. The judgment of the district court is AFFIRMED.