In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1754

FLYNN HANNERS,

*Plaintiff-Appellant,*

*v.*

LARRY TRENT, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:09-cv-03111-MPM-CHE—**Michael P. McCuskey**, *Chief Judge.*

ARGUED DECEMBER 2, 2011—DECIDED MARCH 19, 2012

Before RIPPLE and ROVNER, *Circuit Judges*, and
FEINERMAN, *District Judge.**

RIPPLE, *Circuit Judge.* Flynn Hanners, a former Master
Sergeant with the Illinois State Police ("ISP"), brought
this action in the district court, alleging that fellow ISP
employees Larry Trent, Harold Nelson, Lance Adams,

---

* The Honorable Gary S. Feinerman of the Northern District
of Illinois, sitting by designation.

Richard Woods and Leonard Stallworth discriminated against him because of his race, in violation of 42 U.S.C. §§ 1981 and 1983. The district court granted summary judgment for the defendants, and Mr. Hanners now timely appeals. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

# BACKGROUND

## A. Facts

### 1. The Email

On February 4, 2008, Mr. Hanners, then a Master Sergeant in the Medicaid Fraud Control Bureau of the ISP, sent an email that included pictures and descriptions of eleven fictitious Barbie Dolls to sixteen fellow ISP employees; Mr. Hanners sent the email using his ISP computer and email account.[1] Each fictitious

---

[1] The subject line of the email was "Updated Springfield Area Barbies," and the email itself was entitled "Mattel recently announced the release of limited-edition Barbie Dolls for the Springfield market." R.28-1 at 18. The email included the following:

'Chatham Barbie'
This princess Barbie is sold only at The Gables. She comes with an assortment of Kate Spade Handbags, a Lexus SUV, a long-haired foreign dog named Honey,

(continued...)

---

[1]  (...continued)

and cookie-cutter house. Available with or without tummy tuck and face lift. Workaholic Ken sold only in conjunction with the augmented version.

'Rochester Barbie'
The modern day homemaker Barbie is available with a Ford Windstar minivan and matching gym outfit. She gets lost easily and has no full-time occupation. Traffic jamming cell phone sold separately.

'East Side Barbie'
This recently paroled Barbie comes with a 9mm handgun, a Ray Lewis knife, a Chevy with dark tinted windows, and a Meth Lab Kit. This model is only available after dark and must be paid for in cash (preferably small, untraceable bills), unless you are a cop, then we don't know what you are talking about.

'Panther Creek Barbie'
This yuppie Barbie comes with your choice of BMW convertible or Hummer H2. Included are her own Starbucks cup, credit card, and country club membership. Also available for this set are Shallow Ken and Private School Skipper. You won't be able to afford any of them. This Barbie also comes with her own credit card debt, car loans and three mortgages.

'Riverton Barbie'
This pale model comes dressed in her own Wrangler jeans two sizes too small, a NASCAR t-shirt, and Tweety Bird tattoo on her shoulder. She has a six-pack of Bud Light and a Hank Williams Jr. CD set. She can spit over 5 feet and kick mullet-haired Ken's butt

(continued...)

(...continued)

when she is drunk. Purchase her pickup truck separately and get a Confederate Flag bumper sticker absolutely free!

'Lake Area Barbie'
This collagen injected, bo-toxed, rhinoplastied Barbie wears a leopard print outfit and drinks cosmopolitans while entertaining friends. Percocet prescription available as well as duplex on the lake. Live-in partner Dr. Ken available with new prescription pad and Skipper-on-the-side.

'Pawnee Barbie'
This tobacco-chewing, brassy-haired Barbie has a pair of her own high-heeled sandals with one broken heel from the time she chased beer-gutted Ken out of Divernon Barbie's house. Her ensemble includes low-rise acid-washed jeans, fake fingernails, and a see-through halter-top. Also available with a mobile home.

'Downtown Barbie'
This doll is made of actual tofu. She has long straight brown hair, arch-less feet, hairy armpits, no makeup, and Birkenstocks with white socks. She prefers that you call her Willow. She does not want or need a Ken doll, but if you purchase two Downtown Barbies and the optional Subaru wagon, you get a rainbow flag bumper sticker for free.

'North End Barbie'
This 16-year-old Barbie now comes with a stroller and infant doll. Optional accessories include a GED, bus

(continued...)

doll was a caricature of a stereotypical woman living in an identifiable area in and around Springfield, Illinois.

One of the original recipients, Special Agent Stacy Conner, forwarded the email to three additional ISP employees, including Sergeant Brenda Burton. Concerned that the email might have been "a set up to see how she would react as a supervisor," R.28-1 at 16, Sergeant Burton brought it to the attention of her own supervisor and noted that the email likely was forwarded to her by mistake.

---

[1] (...continued)

pass, and Link Card. Gangsta Ken and his 1979 Caddy were available, but are now very difficult to find since the addition of the infant.

'Leland Grove Barbie / Ken'
She's perfect in every way. Comes with the old money Springfield pedigree and small-mindedness. She belongs to Illini Country Club, the Sangamo Club, and the DAR. (Only available in Caucasian).

'South of Downtown Barbie / Ken'
This versatile doll can be easily converted from Barbie to Ken by simply adding or subtracting the multiple snap-on parts. HeShe comes with his/her own bail bond card and criminal record for prostitution and possession. HeShe has also been banned from Walgreen's and CVS for attempting to purchase more than two boxes of ephedrine-containing drugs in one day.

*Id.* at 19-25 (images omitted).

On April 21, 2008, Captain Scott Rice, Commander of Zone 7, where Sergeant Burton was assigned, completed a Complaint Against Department Member ("CADM") form against Special Agent Conner, and the case was referred to the ISP's Equal Employment Opportunity ("EEO") office shortly thereafter.

The email also was brought to the attention of defendant Richard Woods, who held the position of Investigative Support Commander and was in Mr. Hanners's chain of command. Commander Woods shared the email with his own direct supervisor and with Captain Gordon Fidler, the chief of Mr. Hanners's bureau. Commander Woods directed Captain Fidler to open an investigation and, in particular, to determine whether Mr. Hanners was indeed the source of the email. The email also was brought to the attention of defendants Colonel Harold Nelson, Deputy Director of the Division of Operations; Lieutenant Colonel Leonard Stallworth, Assistant Deputy Director of Special Operations and Lieutenant Colonel Lance Adams, Assistant Deputy Director of Field Operations. All of the defendants except for Lieutenant Colonel Adams were in Mr. Hanners's direct chain of command at the time the email incident took place.

In accordance with Commander Woods's instructions, Captain Fidler contacted the Division of Internal Investigations ("DII") to determine the appropriate course of action. On April 3, 2008, as part of the reporting process, Captain Fidler filed a CADM with DII regarding the email sent by Mr. Hanners.

After reviewing the complaint, DII referred the incident back to Captain Fidler with instructions to continue the investigation. Captain Fidler asked Lieutenant Sheryl Anderson-Martin, Mr. Hanners's direct supervisor, to handle the investigation. As part of the investigation, Lieutenant Anderson-Martin conducted a series of three interviews with individuals who had direct knowledge of the email incident: Sergeant Burton, Special Agent Conner and Mr. Hanners. During his interview, Mr. Hanners admitted to sending the email to fellow ISP employees, including Special Agent Conner. After she completed the investigation, Lieutenant Anderson-Martin met with Captain Fidler to discuss her findings and recommendations. Once the initial investigation was complete, DII resumed control of the investigation and informed Captain Fidler that the matter had been referred to the EEO office.

Although the exact timing is not clear from the record, the EEO office became involved in the investigation of the email incident through the submission of Captain Fidler's CADM. Among its other responsibilities, the EEO office maintains an internal complaint process, which includes options for investigation and mediation. This complaint process, set out in a written ISP policy, requires an employee filing a complaint with the EEO office to sign an intake questionnaire that provides a narrative of what occurred and how the alleged activity constitutes discrimination, harassment or retaliation. Suzanne Bond, Chief of the ISP EEO office, testified in her deposition that a supervisor also

may refer an incident to the EEO office by submitting a signed CADM through DII.[2]

As part of the investigation into Mr. Hanners's email, the EEO office contacted all of the email recipients, but none of these individuals was willing to file a complaint against Mr. Hanners that would state that he had been offended by the email. However, during his interview with the EEO officer, Mr. Hanners eventually admitted that sending the email was an improper use of his ISP email account and acknowledged that he had received training on EEO policies in the past.

Sergeant Robert Sgambelluri, the EEO officer in charge of Mr. Hanners's investigation, concluded that, "[w]hile the contents of the email were related to race, sexual orientation, parental status, pregnancy, family responsibilities, and the characteristics of gender, no person receiving the email reported being offended by its contents." R.28-2 at 45. Notably, he found that none of the individuals who received the email believed that "it interfered with [his] work performance or created an

---

[2] At the same time as the Barbie Doll email investigation, the EEO office also had at least two other ongoing investigations involving inappropriate emails sent using ISP computer equipment. One of the cases involved a District Commander who had sent to the other District Commanders an email that depicted a cartoon of a man and a woman in a car. The man had a traditional seatbelt, while the woman had a seatbelt that went over her lap, shoulder and mouth. A second email incident involved a link to a video that pertained to the proper use of the "F-word."

intimidating, hostile, abusive or offensive work environment." *Id.* (internal quotation marks omitted). Sergeant Sgambelluri ultimately concluded that the investigation did not warrant a charge of hostile work environment under ISP policy.

Sergeant Sgambelluri did conclude, however, that the email "contained derogatory references to women, African Americans, and other categories of people, and presented negative and demeaning stereotypes of these groups." *Id.* He therefore determined that Mr. Hanners's act of transmitting the content of the email to others using an ISP computer and email, without a business reason, was contrary to various ISP policies, including PER-009, which provides that the ISP "will ensure managers and supervisors recognize their responsibility for carrying out the spirit and intent of the EEO Program." *Id.* (internal quotation marks omitted). Additionally, Sergeant Sgambelluri determined that the results of the investigation supported charging Mr. Hanners with violating several Rules of Conduct pertaining to misuse of ISP equipment.

Chief Bond agreed with Sergeant Sgambelluri's finding that Mr. Hanners violated ISP policy and forwarded to ISP Director Larry Trent her recommendation that Mr. Hanners be charged with violating the Rules of Conduct. Chief Bond's recommendation to Director Trent included a citation to PER-009, III.6.C.[3] The memo-

---

[3] ISP policy PER-009, III.6.C provides: "Colonels and their Supervisors and Managers will recognize their explicit respon-
(continued...)

randum also included recommendations for discipline for three other individuals who had further disseminated the Barbie Doll email, including Special Agent Conner.[4]

Director Trent reviewed the EEO office's recommendations and determined that Mr. Hanners should be disciplined in accordance with Chief Bond's recommendations. He then forwarded the recommendations to Colonel Nelson and instructed him to "advise the EEO Office what actions you have taken in response to the charges identified above within 30 days of your receipt of this information." R.28-2 at 48.

## 2.  The Disciplinary Review Board

An ISP officer facing disciplinary action has the right to appear before the Disciplinary Review Board ("the Board"), composed of the Deputy Directors, and to

---

[3]  (...continued)
sibility for carrying out the spirit, as well as the intent, of the EEO Program, including but not limited to the EEO Plan, and actively work to advance the program among the employees they supervise." R.28-2 at 42.

[4] In addition to Special Agent Conner, Special Agent Mari Rolape and Trooper Mark Beagles also were disciplined for forwarding the Barbie Doll email using their ISP computers. Special Agent Rolape was counseled regarding her actions of forwarding the email from her ISP computer to her home computer. Special Agent Conner and Trooper Beagles participated in the settlement agreement process and ultimately received letters of reprimand.

present his own perspective on the case. As part of the process, an officer who takes full responsibility for his actions may agree to a settlement with the Board, and, in doing so, receive a reduced disciplinary penalty. Prior to his appearance before the Board, Mr. Hanners was offered a settlement by Colonel Nelson. Its terms would have reduced his suspension from thirty days to ten to fifteen days—the same suspension that Colonel Nelson was offering to two other officers who were facing similar charges. Although the other individuals accepted Colonel Nelson's settlement proposal, Mr. Hanners rejected the proposed resolution. Mr. Hanners elected to appear before the Board and read from a prepared statement. Following his appearance before the Board, the Deputy Directors unanimously recommended to Director Trent that Mr. Hanners receive the original thirty-day suspension. They expressed concern regarding Mr. Hanners's apparent lack of remorse. Director Trent accepted the Board's recommendation and imposed a thirty-day suspension.[5]

### 3. Ratings Session and Promotions

As part of the ISP employee promotion process, each sworn employee receives an annual promotional rating,

---

[5] Colonel Nelson, as Deputy Director of the Division of Operations, participated in Mr. Hanners's meeting with the Board. Lieutenant Colonel Adams also attended, but only as an observer.

which is given by the employee's direct supervisor.[6] During the 2008 ratings session, approximately thirty individuals, including Mr. Hanners, were to be considered for promotion from master sergeant to lieutenant. Lieutenant Anderson-Martin was Mr. Hanners's rater for 2008. Following the usual protocol, she met with Mr. Hanners to go over the components of the ratings process. She then scored Mr. Hanners on a scale of 1 to 9 in nine different categories and preliminarily calculated his aggregate score as 68. Prior to the ratings session, Lieutenant Anderson-Martin inquired as to whether she should take the email incident into account for purposes of rating Mr. Hanners's job performance; she was told that she should do so. She therefore adjusted Mr. Hanners's aggregate score accordingly. However, when she reviewed her scores with the other supervisors at the ratings session, several individuals, including Commander Woods, suggested that the grade still was too high given the email incident.[7] Lieutenant Anderson-Martin expressed her concern regarding the further lowering of Mr. Hanners's rating because, aside from the email, Mr. Hanners had performed at a high level throughout the year.

At the ratings session, Lieutenant Anderson-Martin felt that the discussion of her grading decision became

---

[6] When a sworn employee seeks a promotion, he must agree to take a promotional examination and receive a job performance evaluation.

[7] Director Trent and Colonel Nelson did not attend the ratings session.

adversarial and that the situation was compounded by the fact that she was being considered for promotion to captain. In what she deemed a difficult situation, Lieutenant Anderson-Martin ultimately agreed to reduce Mr. Hanners's grade to reflect the recommendations given by the other supervisors. Mr. Hanners therefore received an aggregate grade of 54.

Mr. Hanners challenged his promotion grade in accordance with ISP protocol. The challenge was reviewed by Commander Woods, who recommended that Mr. Hanners's grade of 54 be upheld. Further, three of Mr. Hanners's superiors, Captain Fidler, Lieutenant Anderson-Martin and Lieutenant Colonel Stallworth, after considering the merits of Mr. Hanners's challenge, all agreed that his grade of 54 should not be raised. As part of the process, Lieutenant Anderson-Martin was tasked with writing a memorandum in response to Mr. Hanners's contentions. During the drafting of her memorandum in response to Mr. Hanners's challenge, Lieutenant Colonel Stallworth, who had made his displeasure with the content of the email known, informed Lieutenant Anderson-Martin that Mr. Hanners's grade would not be increased above a 54.[8] Lieutenant Anderson-Martin created several drafts of the memorandum;

---

[8] Lieutenant Colonel Stallworth testified at his deposition that he indeed found the Barbie Doll email inappropriate and could not believe that a supervisor would send it out or think it was funny. R.22-7 at 19 (Stallworth Dep. 22). Additionally, he testified that, as an African-American, he found the email to be racially offensive. *Id.* at 22-23 (Stallworth Dep. 25-26).

each draft was rejected until it was deemed to be suffi-
ciently "generic." R.31-5 at 4 (Anderson-Martin Dep. 152-
53). After the challenge was reviewed by the individuals
in his chain of command, including Colonel Nelson,
Mr. Hanners ultimately received a promotion rating of 54.

## B. District Court Proceedings

Mr. Hanners filed a complaint in the Central District
of Illinois. Asserting claims based upon 42 U.S.C. §§ 1981
and 1983, he alleged that he was suspended and graded
unfairly because of his political views and his race.[9]

Addressing Mr. Hanners's contention that the ISP had
imposed sanctions and graded him in a racially discrim-
inatory manner, the district court determined that
Mr. Hanners had failed to establish a prima facie case
of race discrimination based on the direct method.[10]
The court explained that, in order to establish a claim

---

[9] In his complaint, Mr. Hanners alleged that the defendants
retaliated against him because of his political views, in viola-
tion of his rights under the First Amendment. In his brief in
response to the defendants' motion for summary judgment,
Mr. Hanners conceded that there was insufficient evidence
from which a jury reasonably could conclude that the defen-
dants violated his First Amendment rights. The district court
therefore concluded that the defendants were entitled to
summary judgment on Mr. Hanners's First Amendment
claim. This claim is not at issue on appeal.

[10] The district court noted, and the parties appear to agree,
that Mr. Hanners is attempting to prove discrimination by
the direct method only.

under the direct method, Mr. Hanners "'must have provided direct evidence of—or sufficient circumstantial evidence to allow an inference of—intentional racial discrimination.'" R.38 at 24 (quoting *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010)). The court noted that Mr. Hanners did not offer any admissions of discrimination of the kind that would constitute direct evidence, but rather relied upon circumstantial evidence to advance his claim. In reviewing the circumstantial evidence offered by Mr. Hanners, the court noted that Mr. Hanners had failed to compare his thirty-day suspension to similarly situated persons, i.e., the other individuals who had forwarded the Barbie Doll email. Mr. Hanners instead compared his punishment to that of eighteen individuals, only three of whom had misused ISP equipment. All had been involved in activities unrelated to the Barbie Doll email. The court noted that the list provided by Mr. Hanners did not identify any instances of conduct deemed offensive for reasons of race, sexual orientation or gender, nor did it indicate that any of the individuals listed were non-Caucasian. The court therefore concluded that Mr. Hanners had "provide[d] no evidence that employees outside the protected class (*i.e.*[,] non-Caucasians) received systematically better treatment than Caucasians such as Hanners." R.38 at 27-28.

Next, the district court explained that Mr. Hanners could "alternatively show discrimination by establishing 'ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent.'" *Id.* at 28 (quoting

*Montgomery*, 626 F.3d at 393). The court acknowledged that Mr. Hanners "trie[d] to create an inference of discriminatory intent by asserting that: the e-mail would not have been problematic if he were an African[]American; irregularities [existed] in the investigation of the e-mail incident; and Hanners'[s] supervisor was pressured to reduce Hanners'[s] grade when assessing his job performance." *Id.* at 28. The court determined, however, that Mr. Hanners's assertion that the email would not have been problematic if he were African-American, did "not merit much discussion" because, without any supporting evidence, the assertion amounted to nothing more than "mere speculation." *Id.* at 28-29.

The court then turned to the facts surrounding the investigation of the email incident. The court acknowledged Mr. Hanners's contention that the ISP deviated from well-established internal policy during the investigation of the email incident because there was neither a complainant nor a completed EEO intake form. Although the court recognized that an employer's departure from its own internal policies might serve as circumstantial evidence that an employer's stated reason for an adverse employment action is pretextual, it understood the case law to require "more than a deviation from an employer's internal policy" alone in order to withstand summary judgment. *Id.* at 30. In any event, the court explained that there was no deviation from ISP policy, despite the fact that an intake questionnaire never was completed, because Captain Fidler

had submitted the CADM to DII. The court further concluded that Mr. Hanners's assertion that the withdrawal of the investigation from Captain Fidler and Lieutenant Anderson-Martin was evidence of discrimination was at odds with the facts. The court found that the investigation was assigned to Captain Fidler's office for the limited purpose of verifying the origin of the email.

Finally, the court turned to Mr. Hanners's assertion that the defendants improperly had used the email incident to impact his job performance rating during the 2008 ratings and promotions period. The court first explained that, as Mr. Hanners's supervisor and the person charged with grading his job performance, it was Lieutenant Anderson-Martin's conduct that was relevant to Mr. Hanners's discrimination claim based upon the ratings process. The court concluded that, despite the fact that Lieutenant Anderson-Martin felt pressure to reduce Mr. Hanners's rating on the basis of the email incident, there was no evidence that she was ordered by any of the defendants to lower Mr. Hanners's grade. Second, the court noted that Mr. Hanners was permitted to challenge his grade, and that Captain Fidler, Lieutenant Anderson-Martin and Lieutenant Colonel Stallworth unanimously had decided to uphold Commander Woods's recommendation that the grade not be raised. The court therefore concluded that, because Mr. Hanners did not allege any discriminatory animus against Captain Fidler and Lieutenant Anderson-Martin, Mr. Hanners "would have received the same grade regardless of the Defendants' alleged animus." *Id.*

at 35.[11] The court therefore granted summary judgment for the defendants on Mr. Hanners's §§ 1981 and 1983 claims.[12]

## II

## DISCUSSION

### A.  Standard of Review

We review a district court's decision to grant a motion for summary judgment de novo, construing all the facts in the light most favorable to the nonmoving party, Mr. Hanners. *See Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563 (7th Cir. 2009). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as

---

[11] In addition, Mr. Hanners asserted that the defendants were not entitled to qualified immunity. Because the district court concluded that Mr. Hanners did not establish a prima facie case for discrimination, and that the defendants, therefore, were entitled to summary judgment, the court did not consider the issue of qualified immunity.

[12] Mr. Hanners also asserted, in his Memorandum in Opposition to Summary Judgment, that summary judgment would violate his Seventh Amendment right to a jury trial. The district court correctly concluded that the disposition of Mr. Hanners's case on a motion for summary judgment did not deprive him of his Seventh Amendment right to a trial by jury. *See Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 759 (7th Cir. 2006). This issue also is not raised on appeal.

a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008) (internal quotation marks omitted).

## B. Race Discrimination and the Direct Method of Proof

Mr. Hanners contends that he has demonstrated that race was a motivating factor in the decisions to suspend him for thirty days and to lower his promotion rating. In his view, the district court failed to apply the proper standard in evaluating whether he had produced sufficient evidence to avoid summary judgment under the direct method.

A plaintiff proceeding under the direct method "must demonstrate a triable issue as to whether discrimination motivated the adverse employment action." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 672 (7th Cir. 2011); *see also Sheehan v. Daily Racing Form, Inc.*, 104 F.3d 940, 940 (7th Cir. 1997). "A plaintiff proceeding according to the direct method may rely on two types of evidence: direct evidence or circumstantial evidence." *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005). "Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Eiland v. Trinity Hosp.*, 150 F.3d 747,

751 (7th Cir. 1998) (internal quotation marks omitted).[13]

"Circumstantial evidence of discrimination . . . allows the trier of fact 'to *infer* intentional discrimination by the decisionmaker.'" *Rudin*, 420 F.3d at 720 (emphasis in original) (quoting *Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003)); *see also Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). We have explained that "[t]he relevant circumstantial evidence in discrimination cases ordinarily consists of indicators showing what may be 'the real motivating force for employment decisions.'" *Montgomery*, 626 F.3d at 393 (quoting *Coffman*, 578 F.3d at 563). We further have described the circumstantial evidence capable of sustaining a jury verdict as a "convincing mosaic of circumstantial evidence . . . that point[s] directly to a discriminatory reason for the employer's action." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004) (alterations in original) (internal quotation marks omitted). Mr. Hanners challenges the district court's reliance upon this language and asserts that, by using it, the court applied a heightened standard to the

---

[13] *See also Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 347 (7th Cir. 1997) (recognizing that if an employer stated that an employee was discharged "because he is black," that would be direct evidence of discrimination); *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir. 1993) (en banc) (acknowledging as direct evidence of discrimination a manager's statement that an employee would not be promoted because she was not "a black male").

evidence a plaintiff must offer under the direct method in order to avoid summary judgment.

In *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900 (7th Cir. 2006), we clarified that the "mosaic" language, first used by this court in *Troupe v. May Department Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994), was not intended to "promulgate a new standard." *Sylvester*, 453 F.3d at 904. Indeed, we consistently have employed this language to articulate the principle that, for a plaintiff proceeding under the direct method to defeat summary judgment using circumstantial evidence, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had [taken an adverse employment action against] the plaintiff because the latter was a member of a protected class." *Troupe*, 20 F.3d at 737. We therefore cannot accept Mr. Hanners's argument that the district court incorrectly identified and applied the standard for evaluating a plaintiff's proffered circumstantial evidence.

With this background, we turn to an evaluation of the evidence upon which Mr. Hanners relies. First, Mr. Hanners submits a list of other ISP employees who had been disciplined by the ISP. He contends that a comparison between himself and the eighteen listed individuals demonstrates that other employees received less severe punishment despite engaging in misconduct that Mr. Hanners believes to be similar to or worse than his own. However, Mr. Hanners has failed to provide evidence that any of the listed individuals are

non-Caucasian.[14] Nor does Mr. Hanners provide any evidence that non-Caucasians had sent emails containing similar content on the ISP computer system and had received less severe punishment. We therefore conclude that he has failed to demonstrate that individuals outside the protected class received systematically better disciplinary treatment. Absent such circumstantial evidence, Mr. Hanners's assertion that he would not have been suspended for thirty days had he been an African American amounts to mere speculation, which this court consistently has held is insufficient to avoid summary judgment. *See, e.g., Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 337 (7th Cir. 1991).

Furthermore, Mr. Hanners did not demonstrate that the individuals listed were "directly comparable to [him] in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (internal quotation marks omitted). Therefore, he has failed to establish that the listed individuals were in fact similarly situated to him. We have held that "[a]n employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards,

---

[14] *See Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010) (stating that one accepted category of circumstantial evidence is "evidence of systematically better treatment of employees outside the protected class" (internal quotation marks omitted)); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (explaining that comparators must be "similarly situated to the plaintiff other than in the characteristic . . . on which an employer is forbidden to base a difference in treatment").

and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007). Therefore, when a plaintiff alleges that he received harsher discipline than other employees, it is necessary for the court to consider whether the employees engaged in the same conduct for which the plaintiff was disciplined. Here, only three of the individuals listed were disciplined for actions involving the improper use of ISP equipment (two incidents involving pornographic material and one incident involving an email containing a video about the "F-word").[15] In addition, there is no evidence that any of the listed individuals were disciplined for conduct involving the sort of racial and gender stereotyping involved here. Moreover, Mr. Hanners has not shown that any of the individuals whom he offers as comparators had the same leadership responsibilities as he had.

It is also noteworthy that Mr. Hanners did not provide evidence regarding the disciplinary measures taken against the three other ISP employees who had been reprimanded for disseminating the Barbie Doll email. Nor did he provide evidence regarding whether any of

---

[15] As the district court aptly noted, it is unclear whether two of the three incidents, the incidents involving the pornographic material, involved the improper use of an ISP computer or the patrolmen's personal computers.

the listed individuals similarly had refused to accept settlement offers from the Board.[16]

A plaintiff also may show discrimination by establishing "ambiguous statements or behavior toward other employees in the protected group that taken together allow an inference of discriminatory intent." *Montgomery*, 626 F.3d at 393 (internal quotation marks omitted). Here, Mr. Hanners provides statements made by Colonel Nelson, Lieutenant Colonel Adams, Commander Woods and Lieutenant Colonel Stallworth, who said that they found some of the content in the email to be racially offensive.[17] Although the defendants' descriptions of the email pertain to race, they are merely probative of the fact that certain individuals found aspects of the email to be offensive and do not point to any racial animus against Mr. Hanners himself. Mr. Hanners has failed to identify a single instance where the defendants engaged in behavior or made comments that suggested a discriminatory attitude against Caucasians generally or against him because he is a Caucasian.[18] There is evidence that Colonel

---

[16] As noted earlier, Mr. Hanners does not challenge the fact that his thirty-day suspension would have been shortened to ten or fifteen days if he had accepted the Disciplinary Review Board's settlement offer.

[17] Director Trent did not express an opinion regarding the offensive nature of the email.

[18] Mr. Hanners's circumstances, therefore, are different from those where decisionmakers made derogatory comments
(continued...)

Nelson, Lieutenant Colonel Adams, Commander Woods and Lieutenant Colonel Stallworth were upset by the content of Mr. Hanners's email and adamant that he should be disciplined harshly because of it. However, there is no evidence to suggest that the focus of the defendants' comments or actions were related to Mr. Hanners's race as opposed to the inappropriate nature of his conduct. Although Mr. Hanners may believe that the defendants' statements are evidence of racial animus, the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact." *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989).

Mr. Hanners next contends that the atypical handling of his investigation is evidence of discrimination. In particular, he asserts that the ISP's deviation from its

---

[18] (...continued)

about an employee's gender or race shortly before an adverse employment action was taken. *See Phelan v. Cook Cnty.*, 463 F.3d 773, 782 (7th Cir. 2006) (concluding that a female plaintiff had produced sufficient evidence to reach the jury where she was told that she was trying to work "in a man's world" and repeatedly abused and instructed that her workplace was "no place for a woman" shortly before she was terminated); *Volovsek v. Wisconsin Dep't of Agric., Trade & Consumer Prot.*, 344 F.3d 680, 689-90 (7th Cir. 2003) (concluding that a female plaintiff had produced sufficient evidence to reach the jury under the direct method where she overheard her supervisors speaking about "keeping them barefoot and pregnant" shortly before she was denied a promotion).

internal policy as stated in PER-032 is circumstantial evidence of racial discrimination. ISP policy PER-032, III.B.1 provides:

> When an employee, supervisor, or manager reports allegations of discrimination, harassment or retaliation to the EEO Office, the EEO Office will send the employee reporting such discrimination, harassment, or retaliation an EEO Complaint Intake Questionnaire, form ISP1-36, within 5 calendar days of receiving the report.

R.29-2 at 17. Mr. Hanners asserts that no complaint was filed and that no one completed an intake form. He admits, however, that Captain Fidler, as his supervisor, submitted a CADM upon concluding that the email indeed originated from Mr. Hanners. Suzanne Bond, Chief of the ISP EEO office, stated during her deposition that there are two ways in which an EEO investigation may be initiated. She acknowledged that an employee may file a complaint directly with her office and, in doing so, must complete an intake questionnaire. However, she also confirmed that a supervisor may initiate an EEO investigation with a signed CADM or by writing a memorandum to the Chief of EEO requesting an investigation. Therefore, as the district court concluded, the fact that an intake questionnaire never was completed is "immaterial given the submission of Fidler's CADM." R.38 at 32. The evidence shows, and Mr. Hanners does not refute, that despite the language in PER-032, his investigation was initiated in accordance with ISP policy.

Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent. In *Giacoletto v. Amax Zinc Co.*, 954 F.2d 424, 427 (7th Cir. 1992), we held that a jury reasonably could have concluded that, because the employer had "neglected to follow the procedures for helping employees to overcome their deficiencies, [it] had fired [the plaintiff] . . . to retaliate for his refusal to retire." There, the employer had not counseled the employee that his work had fallen below acceptable levels, had not developed a plan to bring his performance up to acceptable levels and had kept no written records of any counseling sessions with him. *See id.* In reaching our conclusion, we explained that, despite the fact that the defendant's witnesses "claimed that the company never applied these procedures to managerial personnel, the express language of the corporate policy statement indicated that the policy applied to [the plaintiff]." *Id.* Similarly, in *Rudin*, we concluded that the employer's departure from its stated hiring policies constituted "circumstantial evidence of discrimination." 420 F.3d at 721. However, *Rudin* is different from the present case because, in addition to the employer's deviation from hiring policy, a Caucasian plaintiff had demonstrated that the deviation had resulted in the hiring of an African-American candidate, who ranked second to last of all of the applicants and had been reinserted into the candidate pool after previously having been eliminated. Further, the reinsertion followed a committee chairperson's repeated statements

regarding pressure to hire a minority. *See id.* at 722-24. Here, as the district court noted, the fact that Captain Fidler submitted the CADM to DII appears to be "in accordance with ISP policy." R.38 at 32.

Mr. Hanners correctly asserts that the usual procedure of having a complainant complete an intake question-naire was not followed. However, the ISP has offered an explanation for this seeming deviation from its pro-cedures by noting that the procedures followed were appropriate when a *supervisor* initiates the process. Indeed, as we noted earlier, Mr. Hanners offers no explicit contradiction for that explanation. *See James v. Sheahan*, 137 F.3d 1003, 1007 (7th Cir. 1998) (declining to consider a deviation of regular practice relevant and probative of discrimination when plaintiff offered nothing to refute defendant's explanation); *see also Briggs v. Potter*, 463 F.3d 507, 516 (6th Cir. 2006). More-over, here the ISP's deviation from its procedures is hardly offered as a justification for the ultimate action taken against Mr. Hanners. The deviation is far more tangential and involves simply the manner in which the charge was initiated. *See Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995). Indeed, a good deal of the concern about Mr. Hanners's conduct was based on the fact that, as a supervisor, he had special obligations to the ISP and its employees to maintain an atmosphere of even-handedness and trust in the ISP. Under these circumstances, a senior officer initiating a disciplinary process in a manner different from that employed in other employee complaints is not indicative of racial animus.

Additionally, we must consider the deviation, along with other circumstantial evidence, in order to determine whether there is sufficient evidence that Mr. Hanners was discriminated against on account of his race such that it "warrants submission of the issue to a trier of fact." *Rudin*, 420 F.3d at 724. Here, given the lack of circumstantial evidence supporting Mr. Hanners's claim of racial discrimination, we conclude that the minor deviation from written policy is insufficient to avoid summary judgment.

Mr. Hanners also points to another alleged procedural discrepancy. He notes that DII initially asked Captain Fidler to investigate the email incident, but later referred the matter to EEO. According to Mr. Hanners, the investigation was "taken away" from Captain Fidler and Lieutenant Anderson-Martin because they "were not going to impose the desired discipline." Appellant's Br. 24. Again, Mr. Hanners's mere speculation, without more, is insufficient to avoid summary judgment. *Karazanos*, 948 F.2d at 337.

Mr. Hanners submits no evidence that suggests that the decision to refer the matter to the EEO office was motivated by any type of racial animus. Rather, Captain Fidler testified in his deposition that he believed that removing the investigation from his work unit was in keeping with other decisionmaking processes within the ISP. He explained that, although such a transfer of an investigation often causes confusion within the unit, it is not out of the ordinary. R.32-6 at 1 (Fidler Dep. 42). Moreover, given the fact that the subject matter of the

investigation was well within the purview of the EEO office, we agree with the district court's conclusion that the series of events that led to the EEO investigation was indeed "unremarkable." R.38 at 32.

Finally, Mr. Hanners argues that ISP policy was not followed in the promotion ratings process because Lieutenant Anderson-Martin, his supervisor, was not permitted the requisite discretion in rating Mr. Hanners, nor was she permitted to respond to Mr. Hanners's challenge in a manner that she deemed appropriate. Mr. Hanners does not provide any written or oral ISP policy that supports this assertion. However, it is clear from the evidence presented that Lieutenant Anderson-Martin was under pressure with regard to the handling of Mr. Hanners's promotion and challenge to the proposed disciplinary action.

The district court correctly identified that it was Lieutenant Anderson-Martin's conduct, as the decision-maker, that was relevant with respect to this aspect of Mr. Hanners's discrimination claim. *See, e.g.*, *Rogers*, 320 F.3d at 754 (explaining that "[a] decisionmaker is the person responsible for the contested decision" (internal quotation marks omitted)). Here, the contested decision is the lowering of Mr. Hanners's promotion rating to reflect the email incident. Therefore, at the outset, Mr. Hanners must demonstrate that Lieutenant Anderson-Martin ultimately lacked the authority to determine his promotion rating. *See Venturelli v. ARC Cmty. Servs., Inc.*, 350 F.3d 592, 600 (7th Cir. 2003). We also must evaluate whether the ratings process "was a sham or conduit

for [the defendants'] alleged racial animosity." *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997). The fact that Commander Woods, Lieutenant Colonel Stallworth and Lieutenant Colonel Adams did not order Lieutenant Anderson-Martin to lower Mr. Hanners's grade does not necessarily mean that they did not act as decisionmakers or exert undue influence over her decision. *See, e.g.*, *Wallace v. SMC Pneumatics Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997) (concluding that a formally subordinate employee should be treated as a decisionmaker because he was "the real cause of the adverse employment action"). However, even if we were to assume that, given the influence they exerted over Lieutenant Anderson-Martin, Commander Woods, Lieutenant Colonel Stallworth and Lieutenant Colonel Adams were indeed the "decisionmakers" with regard to the handling of Mr. Hanners's promotion rating, Mr. Hanners has failed to provide any evidence to support his assertion of racial animus on the part of these defendants. The evidence presented with regard to the ratings session instead demonstrates a strong response on the part of the defendants based upon the content of the email sent by Mr. Hanners and their belief that he should be disciplined severely. In addition, Captain Fidler and Lieutenant Anderson-Martin ultimately joined Lieutenant Colonel Stallworth's rejection of Mr. Hanners's challenge to his grade.

## Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED